UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GREGORY PENZA,

                    Plaintiff,                Case No. 2:22-cv-04985-NG-SIL

   -against-                        **Amended Complaint**

ULC BUSINESS HOLDINGS, LLC,

                    Defendant.
----------------------------------------------------------X

       Plaintiff Gregory Penza ("Penza"), by and through his attorneys, complains against ULC Business Holdings, LLC ("Defendant") as follows:

## Preliminary Statement

       1.      Penza brings this lawsuit to recover $15 million owed to him by Defendant as an additional purchase price for Penza's 100% equity interest in the Companies (as defined below) that he founded, developed and eventually sold in 2020 to Defendant pursuant to an Equity Purchase Agreement between Defendant and Penza. Defendant has failed to remit the $15 million owed despite satisfaction of all conditions for such payment under the Equity Purchase Agreement. Defendant has breached its obligations under the Equity Purchase Agreement, thereby denying Penza the benefit of his bargain. Moreover, as detailed in Count II herein, Defendant has: (1) adopted unreasonable interpretations of key terms of the contract; (2) unilaterally withheld from Penza data to which he is contractually entitled; and (3) attempted to manipulate the terms of underlying contracts, all for the purpose of depriving Penza of $15 million he is owed under the parties' agreement. As to the latter, Defendant's efforts have included, among other steps, intentionally impeding and delaying the execution of qualifying contracts and deliberately attempting to change the title of those contracts to artificially render them nonqualifying under the

parties' agreement.  Through these concerted efforts, Defendant has attempted to unilaterally recast the parties' contract to permit it to realize the full value of its purchase while depriving Penza of a significant portion of the consideration to which he is entitled.

## Parties

2.      Penza is an individual residing in Collier County, Florida.

3.      Upon information and belief, Defendant is a Delaware limited liability company with a principal office at 6325 Ardrey Kell Road, Suite 400, Charlotte, North Carolina 28277. Upon information and belief, Defendant is a wholly-owned subsidiary of SPX Technologies, Inc., a Delaware corporation with a principal office at 6325 Ardrey Kell Road, Suite 400, Charlotte, North Carolina 28277. SPX Technologies, Inc. is a public traded company whose shares are listed on the New York Stock Exchange.

## Jurisdiction and Venue

4.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because jurisdiction is founded on diversity of citizenship, and a substantial part of the events or omissions giving rise to the claim occurred in this District.  Venue is also proper in this District by virtue of the parties' contractual agreement.

## Background

*Introduction*

6.      Until September 1, 2020, Penza owned (a) all of the issued and outstanding shares of common stock of ULC Robotics, Inc. ("ULC"); (b) all of the issued and outstanding shares of

common stock of ULC Robotics International, Inc. ("ULC International"); and (c) all of the outstanding membership interests in ULC Pipeline Robotics LLC ("ULC Pipeline", together with ULC and ULC International, the "Companies").  ULC Robotics International Limited ("ULC UK", together with the Companies, the "ULC Entities") was a subsidiary of ULC International.

7.      The ULC Entities, which maintained their headquarters in Hauppauge, New York, were engaged in the business of, among other things, developing and deploying new robotic systems and advanced technologies. These systems and technologies were designed to inspect, repair and maintain utility and energy pipelines and infrastructure in an efficient and cost effective manner resulting in reduced greenhouse gas emission and less disruption to the public.

8.      Two of ULC UK's largest customers were and, upon information and belief are, Southern Gas Networks PLC ("SGN") and Cadent Gas Limited ("Cadent"), and each have a long-standing relationship with the ULC Entities. That relationship began after the Office of Gas and Electricity Markets, the energy regulator for Great Britain ("OFGEM"), required that energy network companies like SGN and Cadent reduce the risk of gas escapes from aging underground iron pipelines and set forth specific targets for such reduction (the "Remediation Mandate").  To achieve specified targets for reduction of gas escapes from aging underground iron pipelines, OFGEM committed substantial funding, hundreds of millions of pounds, to energy network companies for the cost of remediation of aging iron pipe networks.

9.      SGN engaged and, upon information and belief, continues to engage ULC Entities under multiple contracts to deploy its CISBOT robotic iron pipe joint sealing system, perform contracted research and development projects and contracted pipeline inspection services to satisfy its obligations under the Remediation Mandate.

10.     Operated by ULC crews, the CISBOT robot enters live underground gas mains through a small excavation in the street and seals pipe joints in iron mains, eliminating gas escapes and remediating the pipe for up to 50 years. The CISBOT system, unlike the traditional methods for repairing underground pipes, does not require digging up and replacing aging pipes. The ability to fix underground pipes without large, expensive and time-consuming excavations and trenching provides significant advantages to both energy network companies and their customers, including no interruption to the gas supply for end-users, reduced traffic delays and other disruptions and lower overall costs to customers.  ULC, SGN and Cadent have won several important UK gas industry awards for CISBOT and the UK press has published dozens of articles touting the robot's benefits.

11.     When Penza still held the equity interests in the Companies, ULC performed research and development pursuant to agreements with SGN, and performed CISBOT robotic iron joint sealing pursuant to a Large Diameter Mains Internal Sealing Agreement, dated May 10, 2018 (the "SGN Contract").

12.     Similarly, Cadent engaged ULC UK to satisfy its obligations under the Remediation Mandate.  When Penza held the equity interests in the Companies, ULC performed research and development pursuant to agreements with Cadent, and performed CISBOT robotic iron joint sealing pursuant to a Large Diameter Mains Remediation Contract, dated March 5, 2019 (the "Cadent Contract").

***The Equity Purchase Agreement***
***And Contingent Payment #1***

13.     In June of 2019, ULC engaged the investment banking firm ECM&A to solicit potential purchasers of the Companies.

14.     On March 6, 2020, SPX Corporation ("SPX"), the then parent company of the Defendant, and ULC entered into a non-binding letter of intent (the "LOI") for the acquisition by SPX of all of the equity interests in the Companies for a purchase price of $125,000,000.  No portion of that purchase price was subject to an earn-out or other contingent payment.

15.     Following the execution of the LOI, SPX expressed concern as to whether SGN and Cadent would continue as customers of ULC UK after the expiration of the SGN Contract and the Cadent Contract, which, at the time of execution of the LOI, was set to occur on March 31, 2021 and April 2, 2021 respectively.  Penza believed at the time that because ULC UK was the sole provider of CISBOT cast iron joint sealing services, CISBOT was cost effective and environmentally beneficial and the ULC Entities had a strong relationship with each of SGN and Cadent, those utilities would continue to engage ULC UK to provide CISBOT services as well as research and development and pipeline inspection services.

16.     In response to SPX's concern, SPX and ULC agreed to modify the purchase price for the Companies from $125,000,000 payable at the closing of the sale to $90,000,000 payable at the closing of the sale, plus three contingent payments which, if the contingencies were satisfied, would result in an aggregate purchase price of $135,000,000.  Penza would be entitled to the first contingent payment, in the amount of $15,000,000, if ULC UK had contracts in place with SGN and Cadent by June 1, 2021.

17.     On September 1, 2020, Defendant purchased all of Penza's interests in the Companies pursuant to the terms of the Equity Purchase Agreement dated September 1, 2020, by and between Defendant and Penza ("EPA").  The EPA set forth the terms of the three contingent payments.

18.     Pertinent to this action is Contingent Payment #1, set forth in Section 2.06(a) of the EPA, which obligated Defendant to pay Penza $15,000,000 "[i]n the event that a Qualifying Contract with both of SGN and Cadent is entered into with any ULC Entity during the Renewal Period…".

19.     As defined in Article I of the EPA, a "Qualifying Contract" with respect to SGN and Cadent means:

> either (a) one or more extensions of the applicable ULC Entity's existing Contract with such entity (solely with regard to providing cast iron joint sealing services) for an aggregate period of at least nine (9) months or (b) the execution of new Contracts between any applicable ULC Entity and such entity without regard to the term of any such new Contracts.

20.     "Renewal Period" as defined in Article I of the EPA "means the period commencing on the Closing Date and ending on June 1, 2021."  However, Section 2.06(a)(i) of the EPA provides for an extension of the Renewal Period for a period not to exceed an additional twelve (12) months "[i]n the event that any ULC Entity and SGN or Cadent, as applicable, have not executed a Qualifying Contract by the end of the Renewal Period, but are in active negotiations with respect to the terms of such Qualifying Contract…"

***ULC UK Enters Into Qualifying Contracts***
***With SGN During the Renewal Period***

21.     After the closing of the EPA, one or more of the ULC Entities and SGN engaged in negotiations to extend the term of the SGN Contract.

22.     Upon information and belief, SGN proposed that it and ULC UK enter into an agreement to extend the terms of the SGN Contract by one year, but ULC UK declined to enter into an extension for that length of time and insisted on an extension of only six months.  ULC UK had no legitimate business reason for declining a one-year extension of a contract with one of its key customers SGN.  Upon information and belief, Defendant caused ULC UK to decline a one-

year extension and insist on only a six month extension in an effort to avoid entering into a Qualifying Contract to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA. Defendant's scheme, however, failed.

23.     The ULC Entities' negotiations with SGN resulted in the execution of a Variation Agreement in Relation to Large Diameter Mains Internal Sealing Agreement, dated May 17, 2021 (the "SGN First Extension Agreement"), pursuant to which the parties agreed to extend the SGN Contract for a six month period, from April 1, 2021 through September 30, 2021.

24.     On information and belief, in June 2022, shortly following the last day of the period through which the Renewal Period can be extended on account of active negotiations, ULC UK and SGN signed a second extension agreement (the "SGN Second Extension Agreement", together with the SGN First Extension Agreement, the "SGN Extension Agreements") pursuant to which the parties agreed to extend the term of the SGN Contract by a period of time that, together with the term of the SGN First Extension Agreement, comprises a continuous term of at least nine months.  The execution of the SGN Second Extension Agreement occurred within days following the end of the extended Renewal Period, and, as of June 1, 2022, all that remained open was the ministerial act of executing the SGN Second Extension Agreement. In any event, upon information and belief, the SGN Second Extension Agreement was made effective as of a date prior to June 1, 2022.

25.     The SGN Extension Agreements together constitute a Qualifying Contract under clause (a) of the definition of "Qualifying Contract" because they extended the term of the SGN Contract for an aggregate period in excess of nine (9) months.

26.     Upon information and belief, one or more of the ULC Entities also entered into one or more new Contracts (as defined in the EPA) with SGN during the Renewal Period (collectively,

the "SGN New Contracts").  The SGN New Contracts also constitute Qualifying Contracts under clause (b) of the definition of "Qualifying Contract".

***ULC UK Enters Into Qualifying Contracts
With Cadent During the Renewal Period***

27.     ULC UK and Cadent executed an Extension Agreement in Relation to Large Diameter Mains Remediation Contract, dated July 27, 2021 (the "Cadent Extension Agreement"), pursuant to which the parties agreed to extend the Cadent Contract for a twelve (12) month period, from April 3, 2021 through March 30, 2022.

28.     Upon information and belief, Defendant intentionally delayed, or caused Cadent to delay, the execution of the Cadent Extension Agreement until after June 1, 2021 in an effort to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA. However, Defendant's scheme with respect to Cadent failed as the Cadent Extension Agreement is a Qualifying Contract entered into during the Renewal Period.

29.     The Cadent Extension Agreement constitutes a Qualifying Contract under the EPA because it extended the term of the Cadent Contract for a period in excess of nine (9) months.

30.     ULC UK and Cadent agreed on the terms of the Cadent Extension Agreement, and finalized that agreement, prior to June 1, 2021.  SPX, in response to an inquiry from Penza, specifically advised him that a revised extension agreement was sent to Cadent in May 2021, which Cadent signed without revision in July 2021.  All that remained open as of June 1, 2021 was the ministerial act of executing the Cadent Extension Agreement. In any event, the Cadent Extension Agreement was made effective as of April 3, 2021 – the day immediately following the expiration of the term of the Cadent Agreement – and ULC UK provided services to Cadent from and after April 3, 2021.

8

31.     Even if the terms of the extension agreement were not agreed to and finalized by June 1, 2021, the Cadent Extension Agreement was executed in July 2021, such that the draft extension agreement forwarded by ULC UK in May 2021 was the subject of "active negotiations" through the date of execution.  In either event, the Renewal Period was extended through the date of execution of the Cadent Extension Agreement pursuant to Section 2.06(a)(i) of the EPA.

32.     As such, ULC UK entered into a Qualifying Contract under clause (a) of the definition of "Qualifying Contract" with Cadent during the Renewal Period, as extended by active negotiations.

33.     Upon information and belief, one or more of the ULC Entities also entered into one or more new Contracts (as defined in the EPA) with Cadent during the Renewal Period (collectively, the "Cadent New Contracts").  The Cadent New Contracts also constitute Qualifying Contracts under clause (b) of the definition of "Qualifying Contract".

34.     Upon information and belief, the Cadent New Contracts relate to, among other things, (i) a field trial in Nottingham referenced by ULC in a Twitter post on April 15, 2021; (ii) the deployment of ULC's VGC inspection crawler on behalf of Cadent referenced by ULC in a Twitter post on June 2, 2021; and (iii) the First CISBOT Mechanical Joint Sealing Trial with Cadent in Nottingham referenced by ULC in a Twitter post on June 30, 2021

**Defendant is Obligated to Pay Penza $15,000,000**
**Pursuant to Section 2.06(a)(i) of the EPA**

35.     As was anticipated by Penza, SGN and Cadent remained customers of ULC UK after the closing of the EPA. And, SPX's concern that ULC UK would not continue to do business with SGN and Cadent – the reason behind the reduction of the purchase price payable at the closing of the EPA and the introduction of Contingent Payment #1 – ultimately proved to be unfounded. Not only were the SGN Contract and the Cadent Contract extended during the Renewal Period,

but ULC UK continued to obtain new business from both SGN and Cadent during the Renewal Period.

36.     Thus, the occurrence of each of these events – entry into the extension agreements with both SGN and Cadent (as provided in clause (a) of the definition of "Qualifying Contract"), securing new Contracts with both SGN and Cadent (as provided in clause (b) of the definition of "Qualifying Contract"), or a combination thereof, during the Renewal Period – each independently triggered Defendant's obligation to pay Penza Contingent Payment #1 in the amount of $15,000,000.

37.     Notwithstanding that Defendant timely procured Qualifying Contracts with each of SGN and Cadent, Defendant failed to pay Penza $15,000,000 as required pursuant to Section 2.06(a) of the EPA, and Defendant notified Penza pursuant to a letter dated July 15, 2021, that no such payment was due to Penza.

## COUNT I
### (Breach of Contract)

38.     Penza repeats and realleges paragraphs 1 through 37 above as if fully set forth herein.

39.     Pursuant to Section 2.06(a) of the EPA, in the event that a Qualifying Contract with both of SGN and Cadent was entered into with any ULC Entity during the Renewal Period or any extension thereof, Defendant is obligated, within fifteen (15) business days of the execution of the last Qualifying Contract, to pay Penza $15,000,000 as additional consideration for the Companies.

40.     The SGN Extension Agreements, which were entered into between the parties during the Renewal Period, as extended, together constitute a Qualifying Contract under clause (a) of the definition of "Qualifying Contract".

41.     The SGN New Contracts, which were entered into between the parties during the Renewal Period, constitute Qualifying Contracts under clause (b) of the definition of "Qualifying Contract".

42.     The Cadent Extension Agreement, which was entered into between the parties during the Renewal Period, as extended, constitutes a Qualifying Contract under clause (a) of the definition of "Qualifying Contract".

43.     The Cadent New Contracts, which were entered into between the parties during the Renewal Period, constitute Qualifying Contracts under clause (b) of the definition of "Qualifying Contract".

44.     Because the ULC Entities entered into a Qualifying Contract with both SGN and Cadent during the Renewal Period, Defendant is obligated to pay Penza $15,000,000 pursuant to Section 2.06(a) of the EPA.

45.     However, Defendant has failed to pay Penza $15,000,000 as required pursuant to Section 2.06(a) of the EPA.

46.     By virtue of the foregoing, Defendant has breached its obligations under Section 2.06(a) of the EPA.

47.     Penza has fully performed all of his obligations under the EPA.

48.     As a direct and proximate result of Defendant's breach, Penza has suffered damages in the amount of $15,000,000, plus interest.

49.     Section 7.03 of the EPA provides, in pertinent part, that:

> [Defendant] shall indemnify [Penza] against, and shall hold [Penza] harmless from and against, any and all Losses incurred or sustained by, or imposed upon, [Penza] based upon, arising out of, with respect to or by reason of:
>
> ***

(c)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [Defendant], or, following the closing, the ULC Entities, pursuant to this Agreement.

50.     Article I defines "Losses" as "actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees."

51.     Pursuant to Section 7.03(c) of the EPA, Defendant is obligated to pay Penza damages in the amount of $15,000,000, plus interest, on account of Defendant's breach of Section 2.06(a) of the EPA.

## COUNT II
**(Alternative Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing)**

52.     Penza repeats and realleges paragraphs 1 through 51 above as if fully set forth herein.

53.     Penza asserts this alternative claim for Defendant's breach of the implied covenant of good faith and fair dealing in the EPA.

54.     Implied in the EPA is a duty that Defendant would act in good faith and fairly with Penza, and that it would do nothing to thwart, impede, impair, interfere with or otherwise obstruct in any way Penza's rights to receive the benefits of its contractual bargain.

55.     In particular, Defendant was obligated to act in good faith and fairly, and could not intentionally delay, or cause Cadent to delay, the execution of the Cadent Extension Agreement until after expiration of the Renewal Period in an effort to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA.

56.     ULC UK and Cadent agreed upon the terms of the Cadent Extension Agreement, and finalized the Cadent Extension Agreement, prior to June 1, 2021.  In addition, the Cadent Extension Agreement was made effective as of April 3, 2021 – the day immediately following the expiration of the term of the Cadent Agreement – and ULC UK provided services to Cadent from

12

and after April 3, 2021.  All that remained as of June 1, 2021 was the ministerial act of executing the Cadent Extension Agreement.

57.     However, Defendant intentionally delayed, or caused Cadent to delay, the execution of the Cadent Extension Agreement until after June 1, 2021 in an effort to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA.  In addition, Defendant proposed, or caused ULK UK to propose, in a draft of the Cadent Extension Agreement prepared by Cadent that the title of the agreement be changed from "Extension Agreement" to "Variation Agreement".  This proposed revision, which was rejected by Cadent, was an obvious attempt by Defendant to avoid tracking the text "one or more *extensions* of the applicable ULC Entity's existing Contract" in clause (a) of the definition of Qualifying Contract. The delay in execution of the Cadent Extension Agreement and the proposed revision to its title clearly demonstrates the concerted efforts undertaken by Defendant's to ensure that its agreement with Cadent would not constitute a Qualifying Contract.

58.     Moreover, Defendant was obligated to act in good faith and fairly, and could not intentionally limit the duration of the SGN First Extension Agreement to a length of time less than 9 months in an effort to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA.

59.     Upon information and belief, SGN proposed that it and ULC UK enter into an agreement to extend the terms of the SGN Contract by one year. However, Defendant, with no legitimate business reason for doing so, caused ULC UK to decline SGN's proposed one-year extension and insist on an extension of only six months.  Defendant did so in an effort to avoid entering into a Qualifying Contract to preclude Penza from receiving Contingent Payment #1 pursuant to Section 2.06(a) of the EPA.

60.     Defendant rebuffed Penza's request pursuant to Section 2.06(d) of the EPA, for information to confirm Defendant's compliance with the earnout provisions of the EPA. Defendant provided limited information and conclusory statements that there were no Qualifying Contracts and that the triggers for Contingent Payment #1 had not been met.

61.     By reason of Defendant's conduct, it has breached the covenant of good faith and fair dealing inherent in the EPA.

62.     Penza has fully performed all of his obligations under the EPA.

63.     As a direct and proximate result of the actions of Defendant in breaching the implied covenant of good faith and fair dealing in the EPA, Penza has suffered damages in the amount of $15,000,000, plus interest.

64.     Pursuant to Section 7.03(c) of the EPA, Defendant is obligated to pay Penza damages in the amount of $15,000,000, plus interest, on account of Defendant's breach of the implied covenant of good faith and fair dealing in the EPA.

<u>**COUNT III**</u>
**(Indemnification for Attorneys' Fees and Expenses)**

65.     Penza repeats and realleges paragraphs 1 through 64 above as if fully set forth herein.

66.     Defendant has breached the terms of the EPA as set forth herein.

67.     Plaintiff has incurred, and will continue to incur, attorneys' fees and expenses on account of Defendant's breach, including in connection with this action.

68.     Pursuant Sections 7.03(c) of the EPA, Defendant is obligated to pay Penza the amount of attorneys' fees and expenses reasonably incurred by Penza on account of Defendant's breach, including in connection with this action.

WHEREFORE, Penza respectfully requests that the Court enter judgment in his favor as follows:

a.  awarding damages in the amount of $15,000,000, plus interest;

b.  awarding damages in the amount of additional Losses, including reasonable attorneys' fees and expenses, incurred or sustained by, or imposed upon, Penza based upon, arising out of, with respect to or by reason of Defendant's breach of the EPA; and

c.  granting such other and further relief the Court may deem just and proper.

Dated: November 14, 2022

FARRELL FRITZ, P.C.

By: ___/s/ Patrick Collins_____
     Patrick Collins
     Kevin P. Mulry
     Darren A. Pascarella
     400 RXR Plaza
     Uniondale, New York 11556
     Tel: (516) 227-0700
     Fax: (516) 227-0777

     and

     DAY PITNEY LLP
     Jonathan I. Handler (*pro hac vice*
      application to be submitted)
     One Federal Street
     Boston, Massachusetts  02110
     Tel: (617) 345-4734
     Fax: (617) 206-9324

     Attorneys for Plaintiff Gregory Penza